1

2

3

4                          UNITED STATES DISTRICT COURT

5                        NORTHERN DISTRICT OF CALIFORNIA

6

7    LEON NORFORD,                          Case No.  20-cv-00821-WHO

8                    Petitioner,
                                            **ORDER DENYING PETITION FOR**
9           v.                              **WRIT OF HABEAS CORPUS**

10   WARREN L. MONTGOMERY, Warden

11                   Respondent.

12

13          Petitioner Leon Norford seeks a writ of habeas corpus to reverse or remand his conviction

14   related to a drive-by shooting, or to grant an evidentiary hearing to consider his claims further.

15   *See generally* First Amended Petition for Writ of Habeas Corpus ("Amended Petition") [Dkt. No.

16   14].  Norford seeks habeas relief on six bases: (1) prejudicial ineffective assistance of counsel

17   when trial counsel failed to present a defense gang expert at trial; (2) prejudicial error and denial

18   of due process when the court allowed pretrial photo-based eyewitness identification evidence at

19   trial; (3) denial of due process because the eyewitness identification evidence admitted at trial was

20   false; (4) denial of due process by admission of evidence of petitioner's uncharged behavior; (5)

21   cumulative prejudice from these asserted errors; and finally (6) actual innocence.  *Id.*  Each of the

22   claims lacks merit.  The Petition is DENIED.

23                                      **BACKGROUND**

24   I.     **PROCEDURAL HISTORY**

25          Leon Norford was tried in California Superior Court for Contra Costa County for his

26   involvement in a drive-by shooting on April 17, 2012, in Richmond, California.  On April 7, 2016,

27   a jury convicted him of: murder in the first degree of Lonnie Peterson (under California Penal

28   Code § 187(a)); premeditated attempted murder of Jonathon Whitehead (under §§ 187(a) and

United States District Court
Northern District of California

664); and, criminal street gang conspiracy (under § 182.5).  Answer ("Ans.") Exhibit ("Ex.") 1, Clerk's Transcript ("CT") Vol. 3, Part 2 ("3CT-2") [Dkt. No. 22-1] at 674-682.[1]

On April 29, 2016, Norford was sentenced to life without the possibility of parole.  *Id.* at 712-13; *see also* Ans. Ex. 2, Reporter's Transcript ("RT") Vol. 5 ("5RT") [Dkt. No. 28] at 1058-62.  He timely appealed the conviction, which was affirmed in an unpublished opinion by the California Court of Appeal on August 30, 2018.  *See generally* Ans. Ex. 7 [Dkt. No. 28-2] *People v. Norford*, No. A148253, 2018 WL 4141180 (Cal. App. 1st Div. 2018)  ("App. Opn.").  The California Supreme Court denied the subsequent appeal on November 11, 2018.  *See generally* Ans. Ex. 9 [Dkt. No. 28-2] ("California Supreme Court Order Denying Review," *People v. Norford*, No. A148253, S251559 (Cal. 2018) (en banc)).

On January 31, 2020, Norford filed a writ of habeas corpus in California Superior Court.  The Superior Court issued an order denying the petition on March 6, 2020.  *See* Amended Petition Ex. A [Dkt. No. 14-1] ("State Habeas Order," *In re Leon Norford, On Habeas Corpus*, No. 5-200227-7, Dkt. 5-150276-4 (Cal. Super. Ct. Cnty. Contra Costa Mar. 6, 2020)).  The California Court of Appeal summarily denied the appealed petition on August 20, 2020, and the California Supreme Court summarily denied further review on August 25, 2021.  *See* Ans. Ex. 11 [Dkt No. 28-2] ("Court of Appeal Habeas Docket," *In re Leon Norford on Habeas Corpus*, No. A160230 (Cal. App. 3rd Div. 2020)).  Petitioner then timely filed this federal petition for writ of habeas corpus.

## II.    FACTUAL BACKGROUND

The California Court of Appeal summarized the facts as follows:

> On the afternoon of April 17, 2012, Johnathan Whitehead and Lonnie Peterson were outside the Rancho Market [in Richmond, California], when Whitehead saw a car drive toward them at normal speed. The

---

[1] The jury found several sentence-enhancing factors: (1) that the murder and attempted murder were committed for the benefit of a criminal street gang (under § 186.22(b)(1)); (2) that a principal discharged a firearm causing great bodily injury and death (under § 12022.43(e)(1)); (3) that the murder was committed while Norford was an active participant in a criminal street gang and was committed to further the activities of that gang (under § 190.2(a)(22)); and (4) that a firearm was discharged from a vehicle (under § 190.2(a)(21)).  Ans. Ex. 1, 3CT-2 at 675-77, 679-80.  The jury rejected a further enhancement, finding that Norford did not personally discharge a handgun in the commission of the murder and attempted murder (under § 12022.53(b)-(d)).  *Id.* at 675, 680.

United States District Court
Northern District of California

front and rear passenger-side windows of the car were rolled all the way down, which Whitehead considered a "textbook" indicator of a drive-by shooting. The car pulled to the curb for five or six seconds. Whitehead saw three people in the car: the driver, a person in the front passenger seat, and a person in the back, behind the front passenger. The people in the car looked directly in Whitehead's direction, as if "checking [him] out." Whitehead did not recognize the car or its occupants.

After a few seconds the car started moving again. Two or three seconds later, two people in the car started shooting. Whitehead was shot three times but survived. Peterson was shot three times, sustained a fatal head wound and eventually died.

Whitehead told police that the two shooters were sitting in the front and rear passenger-side seats. The shooter in the front passenger seat had dreadlocks and wore a gray sweater (or "hoodie") and a baseball cap. He had dreadlocks that could have been "long" and were "coming out of his hat." He looked "young," around 18 or 19 years old. Defendant was 19 years old at the time of the shooting.

. . .

Surveillance footage from the Rancho Market showed a gold car—later identified as an Acura Legend—approaching the market before the shooting. The arms of people seated in the front and rear passenger-side seats were extended out their respective windows. The person in the back wore a black sweatshirt and had an "off-white" or "extremely light color[ ]" glove on his hand. The front passenger wore a gray sweater and a hood, and also wore a glove. The shooting occurred at around 1:02 p.m.

The next day, officers located the Acura in front of a home on Burke Street in South Richmond. Contra Costa County Sheriff's Sergeant Christopher Ulep spoke with a resident (the witness) who lived in the home. The witness said that on the day of the shooting she was sitting near the large front window in her home when she saw a man park the car on the street outside, on the same side of the street as her house. A Black male with long dreadlocks got out the car and then jogged down the street. The man wore blue pants, a gray sweater, and something on his head. The witness said she could identify the man if she saw him again.

The Burke Street home had a surveillance system, and the witness retrieved the video from the day of the shootings. The video showed a man with dreadlocks and a hat getting into the Acura in front of the witness's home at 12:47 p.m. on April 17, 2012, about 15 minutes before the shooting, and then driving away. About 1:33 p.m. the man came back and parked the car in front of her home. The man then got out of the car and walked past the home, as she had recalled. A few minutes later the man returned to the car on a bike and appeared to examine the car's exterior. Richmond Police Department Gang Detective Matthew Anderson viewed the video and identified defendant as the man getting in and out of the Acura.

Surveillance video from an intersection near the Burke Street home

showed the Acura traveling on the Richmond Parkway away from Burke Street heading east, in the direction of North Richmond and the Rancho Market, at 12:50 p.m. The quickest way to get from the Burke Street home to the Rancho Market was via the Richmond Parkway. It would take around five minutes driving at the speed limit to get from one place to the other.

On April 26, 2012, Sergeant Ulep presented the witness with a six-person photographic lineup of possible suspects. Defendant was not one of the men in the lineup. The witness told Ulep that the man she saw was not in any of the photographs.

On May 10, 2012, Ulep presented the witness with a six-person photo lineup that included defendant. This time, the witness identified a photo of defendant as the man she had seen in front of her home. She did not hesitate and took only a second to identify him. She was certain and "didn't waiver in her identification."

The witness was uncooperative at trial and attempted to recant her identification of defendant, stating variously that the photograph she identified "does not look like the man that I saw" and "does not look like the person in my mind's eye[]" [(footnote "The Court eventually granted the prosecutor permission to treat her as a hostile witness.")]. The witness did testify consistently with her statement to Sergeant Ulep that she had seen a man park the car and then walk away toward the corner. She paid attention to the man because he was walking toward a corner known for drug sales. The man was Black with a light complexion, of medium height, and with dreadlocks that extended to around two inches below his shoulder.

The witness said she was truthful when she spoke to police and identified the photo of defendant. She was correct when she confirmed at the preliminary hearing that the man she identified in the photo lineup was the man she saw on April 17, 2012. She acknowledged that she circled the photo of defendant, that that was her honest recollection of how the man looked, based on how she remembered him at the time, and admitted she had sufficient memory of the man she had seen to answer under oath several times that the photo she selected was the man she saw in front of her home on the day of the shootings. The witness acknowledged that she previously testified that she identified defendant based on the man she saw in real life—and not based on her home surveillance video—and while the image of the man was fresh in her mind. She admitted she had spoken to Sergeant Ulep after her identification of defendant, after the preliminary hearing, and during trial, but had never recanted her identification of defendant.

. . .

Defendant's cellphone records showed that on 12:47 p.m. on the day of the shootings he made a phone call, which was answered. At 12:48 p.m., defendant received and answered a call from [alleged accomplice] Wallace. Defendant was within one mile of the Burke Street residence when he made the call at 12:47 p.m. and when he subsequently received the call from Wallace. At 1:25 p.m., defendant received a call while he was within one mile of the Burke Street

4

residence. Wallace's cellphone records showed that at 2:29 p.m., he made a call from within one mile of the Burke Street residence.

Based on the cellphone records and corresponding cell tower data, a district attorney investigator opined that defendant was within one mile of the Burke Street residence at 12:57 p.m. on the day of the shootings. Both defendant and Wallace were within one mile of the Burke Street residence at 12:58 p.m. Defendant was back at the original location, within one mile of the Burke Street residence, at 1:25 p.m. Defendant's cellphone activity was consistent with him having been near the Burke Street residence at 12:47 p.m., having travelled northwest in the direction of North Richmond by 12:58 p.m., and having returned[] to the Burke Street residence by 1:25 p.m. There was no evidence that defendant made or received any calls between 12:58 p.m. and 1:30 p.m., which was consistent with him having turned off his phone to avoid leaving[] evidence of his location.

. . .

On May 30, 2012, officers searched the home defendant shared with his family in San Pablo. In defendant's room they found a box of latex gloves hidden behind a television. Also in defendant's room was a gray zip-up sweater, a Cincinnati hat with a "Little Dave" button on it, and a Kansas City Royals hat with "Little Leon" and "3300" embroidered on it. [footnote omitted].

See App. Opn., *People v. Norford*, No. A148253, 2018 WL 4141180 (Cal. App. 1st Div. 2018).

## LEGAL STANDARD

28 U.S.C. § 2254(a) provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a Section 2254 petition "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

AEDPA's "standard of 'contrary to, or involving an unreasonable application of, clearly established Federal law' is difficult to meet, because the purpose of AEDPA is to ensure that

5

United States District Court
Northern District of California

1   federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice

2   systems, and not as a means of error correction." *Greene v. Fisher*, 565 U.S. 34, 38 (2011)

3   (internal quotation marks, alterations, and citations omitted).  The petitioner bears the burden of

4   proof and the state-court decisions are entitled to the "benefit of the doubt." *Cullen v. Pinholster*,

5   563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

6          This standard "applies even where there has been a summary denial" by the state court.

7   *Pinholster*, 563 U.S. at 187.  "When . . . there is no reasoned state-court decision on the merits, the

8   federal court must determine what arguments or theories could have supported the state court's

9   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

10  arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

11  Court." *Sexton v. Beaudreaux*, 138 S. Ct. 2555, 2558 (2018) (internal quotation marks, citations,

12  and alterations omitted).  "If such disagreement is possible, then the petitioner's claim must be

13  denied." *Id.*

14         California's *In re Waltreus*, 62 Cal. 2d 218, 225 (1965), *cert. denied*, 382 U.S. 853 (1965),

15  rule provides that "'any issue that was *actually* raised and rejected on appeal cannot be renewed in

16  a petition for writ of habeas corpus.'"  *Forrest v. Vasquez*, 75 F.3d 562, 564 (9th Cir. 1996)

17  (quoting *In re Harris*, 855 P.2d 391, 398 (Cal. 1993)).  The effect of the *Waltreus* rule is to

18  prohibit the California Supreme Court from reviewing in habeas a claim that was already raised on

19  direct appeal.  *See id.*  A *Waltreus* citation does not bar federal review, however.  *See Calderon v.*

20  *U.S. Dist. Ct.*, 96 F.3d 1126, 1131 (9th Cir. 1996).  In *Ylst v. Nunnemaker*, 501 U.S. 797, 805

21  (1991), the United States Supreme Court concluded that because California habeas petitioners are

22  not required to seek state habeas relief in order to exhaust their claims, a *Waltreus* denial on state

23  habeas has no bearing on a petitioner's ability to raise a claim in federal court.  *See Forrest*, 75

24  F.3d at 564.  Rather, federal courts must "look through" a *Waltreus* citation to the last reasoned

25  state court decision for the AEDPA analysis.  *See id.*

26                                      **DISCUSSION**

27         Norford raises six claims for relief.  Each was raised and adjudicated previously in the state

28  court habeas corpus proceedings, or (through the *Waltreus* rule) by the California Court of Appeal.

*See generally* State Habeas Order; App. Opn.  To secure habeas relief, Norford must show that the last reasoned state court decision was either: (1) "contrary to" or an "unreasonable application" of federal law under the precedents of the U.S. Supreme Court; or (2) the state court's finding of fact was "unreasonable" considering the evidence before that court.  *Pinholster*, 563 U.S. at 181. I address each claim in turn.

## I.   INEFFECTIVE ASSISTANCE OF COUNSEL

Norford argues that he received constitutionally deficient assistance of counsel because his defense counsel failed to introduce a defense gang expert to oppose the prosecution's gang expert.

### A.   Legal Standard

A claim for ineffectiveness of counsel in violation of the Sixth Amendment is shown where a petitioner establishes, first, that his counsel's performance fell below an "objective standard of reasonableness" under prevailing professional norms, *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), not simply that "it deviated from best practices or most common custom," *Harrington v. Richter*, 562 U.S. 86, 105 (2011).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Id.* at 104.

Second, a petitioner must establish that he was prejudiced by counsel's deficient performance, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.  The appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.  "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

The standards of 28 U.S.C. § 2254(d) and *Strickland* are "highly deferential . . . and when the two apply in tandem, review is doubly so." *Harrington*, 562 U.S. at 105 (quotation marks and citations omitted).  "[I]n reviewing the work of their peers, federal judges must begin with the 'presumption that state courts know and follow the law.'" *Dunn v. Reeves*, 141 S. Ct. 2405, 2411 (2021) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).  "The pivotal question" is whether the state court's application of the highly deferential *Strickland* standard "was unreasonable."

United States District Court
Northern District of California

1    *Harrington*, 562 U.S. at 101, 105.

2    **B.      Analysis**

3          The last reasoned decision on this issue came from the superior court, in a decision that

4    was summarily affirmed by the Court of Appeal and the California Supreme Court.  It reviewed it

5    on Norford's habeas petition, applied the *Strickland* standard, and held that Norford failed to show

6    that (1) his trial counsel's performance was deficient under prevailing professional norms, and that

7    (2) there is a reasonable probability that the outcome would have been different had his trial

8    counsel presented a defense gang expert.  *See* State Habeas Order at 3.

9          On the first prong, the superior court noted that Norford failed to submit evidence from his

10   trial counsel to explain whether counsel consulted a gang expert and if not, why not, or any other

11   evidence that could support a finding that trial counsel's performance fell below an objectively

12   reasonable standard.  State Habeas Order at 3.  It also held that even if that evidence had been

13   provided, Norford failed to establish the second *Strickland* prong (that had trial counsel presented

14   a responsive gang expert, there is a reasonable probability that the outcome would have been

15   different).  *Id*.  In support, the court relied on the trial counsel's vigorous cross-examination of the

16   prosecution's gang witness, hitting upon each of the points Norford's habeas expert declared could

17   have been raised by a responsive gang expert.[2]  The superior court concluded that there was no

18   reason, much less one supported by anything in the record, why the presentation of the same

19   points by an expert would have carried more weight than Norford's trial counsel's efforts during

20   his rigorous cross-examination of the prosecution's gang expert.  *Id*.

21         The state court's conclusions were not contrary to or an unreasonable application of federal

22   law.

23         **1.      The Superior Court Reasonably Found that Counsel's Failure to Call a
                     Gang Expert was Not Deficient**

24

25         Norford argues that his trial counsel was ineffective because counsel did not bring a gang

26   expert witness to testify in opposition to the prosecution's gang expert Detective Anderson, and

27   _____

28   [2] In support of his habeas petition in superior court, Norford introduced the declaration of a gang
     expert, Enrique Tira, opining that "there was a lack of evidence at trial to show the crime was
     gang-related."  State Habeas Order at 3.

United States District Court
Northern District of California

that this failure was objectively unreasonable given the prejudicial nature of gang evidence and counsel's duty to investigate all possible defenses. Amended Petition at 33:9-23. The superior court disagreed, holding that Norford had not shown that the first prong of the *Strickland* test was satisfied because "there is no evidence presented [in Norford's petition] regarding the norms of retaining experts in similar cases." State Habeas Order at 3. That determination was not contrary to or an unreasonable application of federal law.

Norford relies primarily on a declaration from Enrique Tira, his gang expert, California state caselaw, and the trial record to support his argument. *See id.* at 30:3-38:6. Tira's declaration before me is the same one that Norford submitted on state court habeas review, where Tira opined:

> [b]ased on my training and experience that if prior to or during the trial of Leon Norford and throughout the process in this case, the defense did not consult with or have a gang expert review the evidence in this case, especially the evidence that was used to attack the gang allegations. My opinion is that if a gang expert with the knowledge in criminal street gangs (gang culture), the defense could have been able to obtain much of the information to assist them at trial.
>
> It is my opinion based on my training and experience that if I would have been consulted with on this case based on the evidence/discovery that I was provided, I could have testified to and given an opinion to the above facts and that this incident was not gang related based on the evidence.

*See* Declaration of Enrique Tira, Amended Petition Ex. B. [Dkt. No. 14-1] ("Tira Decl.") at 15. Based on this declaration, Norford argues that it was constitutionally ineffective for his trial counsel to fail to present a responsive gang expert. *See* Amended Petition at 30:3-31:4, 33:9-20; Traverse at 14:14-15:10. He contends that "[a]s a practical matter, the only way to counter prosecution expert gang testimony is with a defense gang expert," and that his trial counsel was ineffective by failing to adequately "investigate" the case and counter with a responsive gang expert. Amended Petition at 33:9-34:3.

The superior court noted that Norford failed to submit a declaration from trial counsel regarding his investigation and trial strategy or a declaration regarding what "prevailing professional norms" are for a case seeking gang enhancements.[3] As the superior court stated,

---

[3] Tira's declaration states only his opinions that the case "was not gang related," there was a "lack

1    Tira's declaration merely rehashes why, in his opinion, the prosecution's evidence was inadequate

2    to establish the gang enhancement.  *Id*.

3            More significantly, Norford fails to cite any federal law demonstrating that defense counsel

4    can be considered ineffective when they fail to present an expert to opine on the kinds of evidence

5    Tira alleges that he could have provided.  Norford relies on state cases and California legislation

6    suggesting or requiring bifurcation of gang enhancement evidence from underlying criminal

7    proceedings.  *See* Amended Petition at 32:18- 36:8.[4]  Like the Tira declaration, the state cases and

8    legislation do not demonstrate that Norford's counsel was constitutionally ineffective by not

9    presenting an opposing gang expert at trial; those sources simply confirm that gang evidence may

10   be highly prejudicial where it has minimal probative value or is otherwise ancillary to the case,

11   and that defense gang experts must be allowed to testify if defendants offer them.  *See id*.

12           Norford only begins to address the professional competency of his trial counsel when he

13   relies on a California state case to point out that trial counsel have a general "obligation to

14   investigate all possible defenses" through "adequate investigation" before trial.  *See* Amended

15   Petition at 32:12-17, 36:9-14 (citing *In re Edward S.*, 173 Cal. App. 4th 387, 407 (2009)).

16   Norford relies on this duty of investigation to argue that because his trial counsel was given notice

17   pre-trial of the prosecution's intent to bring a gang expert to the stand, counsel should have hired a

18   responsive expert.  But even assuming that the California state caselaw is relevant, trial counsel's

19   decision not to hire a defense gang expert does not mean counsel's *investigation* into Norford's

20   defenses was deficient.  In his Traverse, Norford relies on Ninth Circuit caselaw recognizing the

21   same general duty to investigate.  *See* Traverse at 19:7-20:12 (citing *Rios v. Rocha*, 299 F.3d 796,

22   805 (9th Cir. 2002) (holding that a defense counsel who decided against using a potentially

23   _____

24   of evidence/factors" to establish the gang enhancement, trial counsel did not consult a gang expert,
     and if he had been consulted at trial Tira could have testified that the incident was not gang
25   related.  Dkt. No. 14-1.

26   [4] For example, in his Traverse Norford relies on portions of California's STEP Forward Act of
     2021 that provides in relevant part: "Bifurcation of trials where gang evidence is alleged can help
27   reduce its harmful and prejudicial impact."  STEP Forward Act of 2021 § 2(f), 2021 Cal. Legis.
     Serv. Ch. 699 (A.B. 333) (WEST); *see* Traverse at 15:25-17:15.  However, the statute says
28   nothing about defense counsel's obligations in response to the prosecution's presentation of gang
     evidence, nor any obligation to present a responsive gang expert.

winning defense before reasonably investigating the case was deficient)).  There is nothing in the record to support the assertion that trial counsel failed to adequately *investigate* Norford's defenses to the gang evidence.  The record, as discussed in more detail below, shows that Norford's trial counsel vigorously cross-examined the prosecution's gang witness on each of the points Tira identified that he would have focused on if he had testified.

Federal law—which controls the AEDPA analysis—holds that due to the strength of the tool of cross-examination, there is no general duty for defense counsel to bring an opposing expert witness.  As the Supreme Court explained in *Harrington*, "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.  In many instances cross-examination will be sufficient to expose defects in an expert's presentation.  When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict."  *Id*. 562 U.S. at 111.  The Court rejected the argument that defense counsel's failure to call an expert witness to dispute blood evidence satisfied the first prong of the *Strickland* test, stating that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy.  Here Richter's attorney represented him with vigor and conducted a skillful cross-examination.  As noted by the superior court, defense counsel elicited concessions from the State's experts and was able to draw attention to weaknesses in their conclusions because their analyses were conducted long after investigators had left the crime scene.  For all of these reasons, it would have been reasonable to find that Richter had not shown his attorney was deficient under *Strickland*."  *Id*. at 111.

The same is true here.  It was not unreasonable or contrary to federal law for the superior court to conclude that Norford's defense counsel "vigorously cross-examined [the prosecution's gang expert] regarding his opinions and weaknesses in the. . . evidence he relied upon."  State Habeas Order at 3.  That conclusion is amply supported by the trial transcript that shows Norford's defense counsel used cross-examination to question: Detective Anderson's lack of systematic documentation of purported Richmond area gang members and their activities; the availability of non-gang explanations for the social media posts showing Norford with other

1    known gang members; the lack of gang-related tattoos on the Norford body or gang identification

2    documents attributed to the Norford in any official system; and Anderson's lack of any

3    documentation of his asserted "four or five" contacts with Norford prior to the trial.  *See* RT, Ans.

4    Ex. 2C-2 [Dkt. No. 26] at 660-62, 675-76, 680-81.

5         Norford cites two U.S. Supreme Court cases in his Amended Petition to argue that his

6    counsel was ineffective.  *See* Amended Petition at 33:27-34:3, 34:9-11.  He relies on *Davis v.*

7    *Alaska*, 415 U.S. 308 (1974) for the proposition  that a defendant has a right "to present his or

8    defense theory" and all of the "pertinent evidence should be considered by the trier of fact."

9    Amended Petition at 34:9-11 (citing *Davis,*  415 U.S. at  317 ("[W]e do conclude that the jurors

10   were entitled to have the benefit of the defense theory before them so that they could make an

11   informed judgment as to the weight to place on [a witness's] testimony.")).  Norford's trial

12   counsel satisfied that right through a vigorous cross-examination of Detective Anderson to support

13   the defense's argument that there was insufficient evidence of gang membership and to attack

14   Detective Anderson's credibility due to his poor methodology.  *See, e.g.*, Amended Petition at

15   20:5-7, 29:11-14; *see also* RT, Ans. Ex. 2C-2 at 660-62, 675-76, 680-81.  Norford also cites *Brady*

16   *v. Maryland*, 373 U.S. 83 (1963) for the established "requirement that the prosecution disclose all

17   exculpatory evidence in [its] hands," including those with law enforcement. *See* Amended Petition

18   at 33:27-34:3 (citing *Brady*, 373 U.S. at 87-88).  He fails to explain what exculpatory evidence the

19   prosecution had and failed to produce.  *Brady* is inapposite.

20        Here, as in *Harrington*, the state court was reasonable when it concluded that Norford

21   failed to satisfy the first prong of *Strickland* that his trial counsel acted "outside the wide range of

22   professionally competent assistance."  *Strickland*, 466 U.S. at 690; *see also Harrington*, 562 U.S.

23   at 111.

24            **2.    The Superior Court Reasonably Found that there was No Reasonable**
                      **Probability that Offering a Defense Gang Expert Would Have Changed**
25                    **the Trial Outcome**

26        Because I have determined that the state court was reasonable when it found that Norford

27   failed to satisfy the first prong of the *Strickland* test, I need not evaluate whether Norford has

28   satisfied the second part of the *Strickland* test—whether he suffered prejudice from counsel's

United States District Court
Northern District of California

1   decision not to hire an opposing gang expert.  Nonetheless, I find that the superior court's

2   determination that Norford failed to demonstrate a reasonable probability of prejudice – in light of

3   the defense counsel's rigorous cross-examination of Detective Anderson and the circumstantial

4   evidence – was not contrary to or an unreasonable application of federal law.  State Court Habeas

5   Order at 3.

6          In his Petition and Traverse, Norford's primary argument is that introduction of gang

7   evidence is inherently prejudicial.  Amended Pet. at 37:26-38:6; Traverse 15:11-16:3.  That

8   argument was addressed and rejected above.  The state court authorities relied on by Norford

9   establish only that gang evidence can be prejudicial when not relevant to the underlying charges

10  and that bifurcation or introduction of a defense gang witness are some of the measures available

11  in state court to avoid prejudice in *those* circumstances.

12         Norford also contends in his Traverse, that the cross-examination of Detective Anderson

13  did not ameliorate the prejudice from failing to present a defense gang expert.  Traverse at 18-20.

14  Norford does not identify any specific weaknesses in that cross-examination (*e.g.*, evidence not

15  challenged on cross-examination) or any favorable evidence or arguments that were not introduced

16  at trial.  He relies only on Tira's declaration.  That opinion was considered and accurately

17  characterized by the state court as amounting to a "recitation of the same arguments and

18  observations raised on cross-examination" by Norford's trial counsel.  State Habeas Opinion at 3.

19  Norford does not identify any particular points in Tira's expert opinion that were _not_ discussed at

20  trial on cross-examination or explain how having trial counsel raise the issues on cross, as opposed

21  to through a defense expert, prejudiced Norford under federal law.[5]

22

23  ─────────────────────

24  [5] Throughout his Amended Petition and Traverse, Norford cites to United States Supreme Court
    and California cases that are unhelpful given the arguments he makes or are inapposite to the
    analysis required by AEDPA.  *See* Amended Petition. at 33:27-34:3, 34:9-11; Traverse at 15:11-
25  24.  For example, Norford relies on *Michelson v. United States*, 335 U.S. 469 (1948).  But that
    case simply recognized that unfairly prejudicial character evidence should be excluded because "it
26  is said to weigh too much with the jury and to over persuade them as to prejudge one with a bad
    general record and deny him a fair opportunity to defend against a particular charge."  *Id.* at 475-
27  76.  The gang evidence here was not only central to the case and therefore could not be "unfairly
    prejudicial," it was also vigorously contested by trial counsel.  *See also Almendarez-Torres v.
28  United States*, 523 U.S. 224, 235 (1998) (recognizing that evidence regarding "defendant's prior
    crimes risks significant prejudice").

13

1    Finally, Norford challenges Respondent's reliance on *Panah v. Chappell*, 935 F.3d 657,

2    668-70 (9th Cir. 2019), where the Ninth Circuit held that it was "inconceivable" that trial

3    counsel's lack of pre-trial investigation into serology and pathology changed the trial outcome in

4    light of "overwhelming" evidence against the defendant. *See* Traverse at 18:10-19:5. Norford

5    attempts to distinguish *Panah* from his case by claiming that "evidence of [his] guilt was weak

6    and subject to serious doubt." *Id.* But he argues elsewhere in his Petition that there was an

7    "overflowing bucket of prosecution gang evidence." Amended Petition at 58:20-22. Norford's

8    trial counsel challenged the strength of that evidence, pointing out the same weaknesses that Tira

9    identifies.

10    Norford has failed to establish either prong of the *Strickland* test for ineffective assistance

11    of counsel. He has not shown under AEDPA that the conclusion of the superior court on his

12    ineffective assistance of counsel claim for failure to present a defense gang expert was contrary to

13    or an unreasonable application of clearly established federal law.

## II.    PHOTO IDENTIFICATION EVIDENCE AT TRIAL

15    Norford's second claim for habeas relief is based on the trial court's denial of his motion to

16    suppress an eyewitness identification of him from a photo array. He argues that the photo array

17    violated his rights to due process because the array was unduly suggestive: he was the person in

18    the array with the lightest complexion and longest hair. He also notes that at trial, the eyewitness

19    who identified Norford in the photo array admitted that she "did not know why" she had selected

20    Norford out of the array and admitted that it might have been because he was the one with the

21    lightest complexion and longest hair. *See* Amended Petition 38:8-44:28.

22    Norford raised this claim on direct appeal. The California Court of Appeal noted that the

23    eyewitness did not identify anyone in the first array she was shown, but "unhesitantly" identified

24    Norford when shown the second array including Norford's photo. App. Opn. at 7-8.[6] The court

25    explained that on the day of the shooting, the eyewitness viewed the man subsequently identified

---

[6] The first photo array that did not include a photo of Norford was conducted nine days after the crime, on April 26, 2012. *See* App. Opn. at 4. At the next lineup on May 10, 2012, still within a month of the incident, the eyewitness "did not hesitate" when she identified Norford in "only a second." *See id.*

United States District Court
Northern District of California

as Norford for 10-15 seconds from a distance of 25-28 feet, paid particular attention to him because she thought he was going to buy drugs, and described him as having dreadlocks that fell three to four inches below the shoulder.  *Id.* at 8.

The court noted that in denying the motion to suppress, the trial court recognized that Norford had the longest hair of those in the second array, but that was a distinction of only a matter of degree as he was not the only one with "long" hair in the second array.   The trial court considered the totality of the circumstances (including the proximity and length of time the witness had to view the man), and concluded that the array was not unduly suggestive.  *Id.*  The court of appeal agreed, finding that the "differences [among the lineup's suspects] did not cause defendant to 'stand out' from the others in a way that would suggest the witness should select him," and "[t]he identification procedure was not unduly suggestive and was reliable under the totality of the circumstances."  *See* App. Opn. at 8-9.  It concluded that the photo lineup identification evidence was properly admitted.  *Id.* at 9.

 Norford raised this claim again on habeas review; the superior court denied it under the *Waltreus* rule.  *See* State Habeas Order at 7 (citing *In re Waltreus*, 62 Cal. 2d 218, 225 (1965)).  Therefore, under ADEPA, the question is whether the California Court of Appeal's determination was contrary to or an unreasonable application of federal law.  For the reasons explained below, it was not.

### A.       Legal Standard

"A conviction which rests on a mistaken identification is a gross miscarriage of justice." *Stovall v. Denno*, 388 U.S. 293, 297 (1967).  The Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit."  *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (citing rights to counsel, compulsory process, confrontation, and cross-examination as examples).  The ultimate question of the constitutionality of pretrial identification procedures is a mixed question of law and fact.  *See Van Pilon v. Reed*, 799 F.2d 1332, 1336 (9th Cir. 1986).

Due process requires suppression of eyewitness identification evidence "when law

15

enforcement officers use an identification procedure that is both suggestive and unnecessary." *Perry*, 565 U.S. at 718; *see Manson v. Brathwaite*, 432 U.S. 98, 107-09 (1977); *Neil v. Biggers*, 409 U.S. 188, 196-98 (1972).  The purpose of this rule is "to deter police from rigging identification procedures."  *Perry*, 565 U.S. at 258.  Consequently, in "cases in which the suggestive circumstances were not arranged by law enforcement officers," due process does not require exclusion of the identification evidence.  *Id.* at 720-21.

Clearly established federal law requires a two-step inquiry.  First, Norford must show that "'the police used an unnecessarily suggestive identification procedure.'"  *Walden v. Shinn*, 990 F.3d 1183, 1198 (2021) (quoting *Perry*, 565 U.S. at 235).  Second, if Norford shows there was "improper police conduct," then the question is whether such police conduct "created a substantial likelihood of misidentification" due to poor reliability of the evidence considering the totality of the circumstances.  *Id.* (citing *Perry*, 565 U.S. at 239).  If the identifications were not the product of impermissibly suggestive police procedures, there is no need to assess the reliability of each identification under the totality of the circumstances.  *Walden*, 990 F.3d at 1201.

An identification procedure is impermissibly suggestive when it emphasizes the "focus upon a single individual" and thereby increases the likelihood of misidentification.  *See United States v. Bagley*, 772 F.2d 482, 493 (9th Cir. 1985), *cert. denied*, 475 U.S. 1023 (1986); *see, e.g.*, *United States v. Burdeau*, 168 F.3d 352, 357-58 (9th Cir. 1999) (finding that photo placement, hue and facial expression were insubstantial differences between defendant's photograph and the others in a photographic array and did not create an impermissible suggestion that defendant was the offender).  Mere variations in appearance among persons or photographs presented to a witness do not automatically invalidate a pretrial identification.  *Walden*, 990 F.3d at 1199 ("The law only requires that line-ups depict individuals who basically resemble one another such that the suspect's photograph does not stand out.") (internal quotation marks and citation omitted).

"Reliability of the eyewitness identification is the linchpin" to determine whether there was a "substantial likelihood of misidentification."  *Perry*, 565 U.S. at 239 (citing cases).  To determine whether out-of-court identification testimony is sufficiently reliable, federal courts consider five factors: (1) the witness's opportunity to view the defendant at the time of the

1    incident; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description;

2    (4) the level of certainty demonstrated by the witness at the time of the identification procedure;

3    and (5) the length of time between the incident and the identification. *See Manson*, 432 U.S. at

4    114; *see also United States v. Drake*, 543 F3d 1080, 1089 (9th Cir. 2008), 543 F.3d at 1089

5    (finding that where first four factors weighed in favor of reliability, four-day delay between

6    robbery and photo spread identification did not call identification's accuracy into question).

7        **B.**      **Analysis**

8        Norford contends that he was prejudiced at trial because the photo array was unduly

9    suggestive in that he was the only one with a "light" complexion and dreadlocks that went past his

10   shoulders, and argues that "other evidence" corroborates his claim that the photo array was unduly

11   suggestive. That "other evidence" includes the eyewitness's testimony at trial that the photo she

12   identified in the array "does not look like the man I saw" and while she could not explain why she

13   choose that photo from the array, at the time of trial she said that it "does not look like the person

14   in my mind's eyes." *See* Amended Petition at 38:8-44:25. When pressed on cross-examination,

15   the eyewitness suggested that she chose Norford's photo because it "looked like the person [the

16   police] were asking me about." *Id*. at 41. Norford argues that the trial testimony of the eyewitness

17   suggests that she was "fundamentally uncertain" about the identification and may have been

18   subject to persuasive comments about the subject by the police officers administering the array.

19   *Id*. Finally, he notes that the surviving victim (Whitehead) was shown multiple photo arrays and

20   never identified Norford's photos. Amended Petition at 44.

21        I conclude that the California Court of Appeal's decision was not contrary to or an

22   unreasonable application of clearly established Federal law. As noted by the trial court in denying

23   the motion to suppress, each of the individuals in the second array had long dreadlocks – even if

24   Norford was the only one whose dreadlocks extended a few inches beneath his shoulders – and

25   Norford may have had the lightest complexion of those included, but after viewing the photo array

26   the trial court and Court of Appeal did not find it unduly suggestive. Moreover, the Court of

27   Appeal weighed the factors suggested by the Supreme Court and reasonably determined that the

28   identification was sufficiently reliable given the amount of time the eyewitness viewed the

United States District Court
Northern District of California

17

1    suspect, her unobstructed view, and the careful attention she gave to the suspect on the day in

2    question, and that she rejected all photos in the first array but did not hesitate in picking out

3    Norford from the second array. *See Manson*, 432 U.S. at 114 (applying five factors to determine

4    photo array reliability); *see also Drake*, 543 F.3d at 1089 (same).

5         Norford relies on *Simmons v. United States*, 390 U.S. 377, 385 (1968) to contrast the

6    holding there, that there is "little possibility of misidentification" where witnesses observed

7    suspects for two to five minutes, with the 10-15 second of unobstructed view here, which he

8    claims was insufficient. *See* Amended Petition at 42:5-8. But *Simmons* did not set a floor on

9    timing for reliability of identifications. True, the Court cautioned that "brief glimpses" of suspects

10   might be unreliable. *Simmons*, 390 U.S. at 383-85 (warning about the potential unreliability "brief

11   glimpse[s]" of suspects, but not stating such "glimpses" are always unreliable)). But it

12   subsequently explained that even brief glimpses might lead to reliable identifications. *See Neil v.*

13   *Biggers*, 409 U.S. at 198 ("[We have] held admissible an in-court identification by a witness who

14   had a fleeting but 'real good look' at his assailant in the headlights of a passing car." (quoting

15   *Coleman v. Alabama*, 399 U.S. 1, 4 (1970))). In this case, the eyewitness focused on the suspect

16   for 10-15 seconds in the daylight with an unobstructed view from 25-28 feet. *See* CT, Vol. 1, Ans.

17   Ex. 1A-1 [Dkt. No. 19-3] at 13-14, 23-24, 26-27. Norford provides no authority that this was not

18   a "good view" sufficient for reliability.

19        Over a year later at trial the witness testified that the photo was not the person she then saw

20   in her "mind's eyes" as the suspect and could not explain why she chose Norford's photo at the

21   time of the photo array, but that does not undermine the reliability or accuracy of her initial

22   identification. Because the second photo array was conducted within a month of the incident –

23   and given the focus with which she viewed the suspect at that time – as well as her consistent

24   testimony at the preliminary hearing--the court of appeal's accuracy determination is well-

25   supported. *See, e,g.,* CT, Vol. 1, Ans. Ex. 1A-1 at 27-28 (eyewitness testifying at the preliminary

26   hearing she "notice[d the suspect] more" because "it made [her] think that he may have been going

27   around the corner to get drugs, because someone used to sell drugs around the corner."); *see also*

28   *Biggers*, 409 U.S. at 199 (the focus is on "the level of certainty demonstrated by the witness at the

United States District Court
Northern District of California

18

confrontation [procedure]").[7]  In addition, the specificity of the eyewitness's initial description—that the suspect had a long face, was a Black man with a light complexion, had a red handkerchief hanging out of his back pocket, and had dreadlocks that extended several inches below the shoulders—also supports the conclusion that she was focused and attentive when she first saw the suspect and that her identification within a month of the incident was reliable and not the product of an unduly suggestive second photo array.  *See* CT, Vol. 1, Ans. Ex. 1A-1 at 14, 17, 24, 26; *see also Manson*, 432 U.S. at 115 ("No claim has been made that [the habeas corpus petitioner] did not possess the physical characteristics [initially] described" by the eyewitness).

Finally, Norford contends that because the surviving victim of the shooting did not identify him in any of "multiple" photo lineups, the reliability of the recanted eyewitness identification is further undermined.  *See* Amended Petition at 43:25-44:4; *see also* Traverse 25:13-18.  But the accuracy standard compares the petitioner's appearance to the description given by the eyewitness, not to the ability of other witnesses to identify the petitioner in police lineups.  *See Manson*, 432 U.S. at 115.

### 1.     The California Court of Appeal Reasonably Found the Eyewitness Photo Identification Procedure was Not Unduly Suggestive

Because I conclude that the California Court of Appeal was reasonable when it found that the "challenged identification [was] reliable, then testimony as to it and any identification in its wake [was] admissible," even if the lineup was unduly suggestive.  *Manson*, 432 U.S. at 110 n.10.  Therefore, I do not need to consider whether the California Court of Appeal was unreasonable when it concluded that the lineup was not unduly suggestive.  *See* App. Opn. at 8-9; *see also Reed*, 799 F.2d at 1339 ("Because the record fairly supports the conclusion that the identifications were reliable, the district court correctly denied relief. . .  even after assuming for the purpose of argument that the encounter at the suppression hearing was suggestive.").  But I will.  The state

---

[7] Norford and Respondent offer competing reasons why the eyewitness attempted to recant her identification on the stand.  *Compare* Amended Petition at 20:16-21:10 (arguing witness did not like how she was treated by the officers and attempted to identify a photo showing the man police were asking her about) *with* Ans. at 16:11-17:3, 18:18-20 (suggesting she recanted out of fear for her safety, as she testified in court, *see* RT, Vol. 2, Ex. 2B-1 at 340-41).  I need not resolve this question, but note that the California Court of Appeal found the safety issue a "plausible" explanation for the witness's apparent recantation.  *See* App. Opn. at 11.

United States District Court
Northern District of California

1    court was reasonable under federal law when it found the lineup was not unduly suggestive.

2         Norford contends that the identification procedure was unduly suggestive in the

3    arrangement of the second of the two photo lineups because Norford's features "stood out

4    markedly from [those of] the other[]" suspects shown.  Amended Petition at 40:5-28.  He says that

5    in the second lineup on May 10, 2012, he was the only person shown with a "light complexion"

6    and the only person shown with "dreadlocks that hung a couple inches past his shoulders."  *Id.* at

7    40:14-17.  He argues further that his face was the least round and his pupils were the "most

8    pronounced" of those belonging to the six men shown to the eyewitness in that lineup.  *See*

9    Traverse at 22:3-17.

10        The California Court of Appeal concluded that Norford did not "stand out" from the

11   others.  *See* App. Opn. at 9.  The court observed that Norford shared several features with the five

12   others in the array: they were all African American, young, and wore dreadlocks.  *See id.* at 8-9;

13   *see also* CT Vol. 2, Ans. Ex. 1B-2 at 408 (displaying this photo lineup).  And it held that the

14   varying lengths of dreadlocks and varying shades of complexion were "not the striking feature[s]

15   of the photographs," so none of the six men "stand out" due to their complexion and hair lengths.

16   App. Opn. at 9.  No caselaw supports Norford's contention that lineup was unduly suggestive in

17   the ways Norford argues it was, and the state court was reasonable when it concluded that

18   appearance of the lineup alone – despite Norford's inches-longer hair length, lighter complexion,

19   longer face, and pronounced pupils – was not unduly suggestive: the distinctions Norford relies on

20   are not "the striking features" of the photographs.  *Id.*

21        Norford also argues that there was intentional police misconduct in carrying out the lineup

22   identification procedure.  That argument is based on the eyewitness's attempts to recant her prior

23   lineup identification of Norford and her failure to identify him at trial.  *See* Amended Petition at

24   40:5-13, 41:3-15.  He cites the eyewitness's court statement that she identified Norford in the

25   array because he "[L]ooked like the person [the police] were asking me about" to imply that police

26   were impermissibly coaching her to select Norford.  *See id.* at 41:9-15; *see also* RT, Ans. Ex. 2B-1

27   at 328-29.

28        Norford has not shown that the police intentionally made the lineup suggestive.  The police

20

1    told the eyewitness prior to the array that she had no obligation to choose anyone and that the man

2    she saw was not necessarily in the array.  *See* CT Volume 2, Ans. Ex. 1B-1 at 384, 3879.  The

3    eyewitness was not asked to identify Norford in-person at the preliminary hearing, nor could she:

4    he was not present for her testimony about her prior identification.  *See* CT, Vol. 1, Ex. 1A-1 at 5-

5    11, 13-47.  And Norford takes her trial testimony out-of-context: to clarify it, the eyewitness was

6    asked if she "identif[ied] the person on that day [in the lineup] as being the man [she] saw," to

7    which she replied, "Yes."  CT Vol. 1, Ex. 1A-1 at 32.

8         The California Court of Appeal was reasonable when it found that the photo lineup was not

9    unduly suggestive.  *See* App. Opn. at 8-9.

10              **2.    The California Court of Appeal Reasonably Found Norford was Not**
                       **Prejudiced by Admission of the Photo Lineup Identification**
11

12        Constitutional claims of prejudicial error brought on federal habeas corpus proceedings are

13   evaluated based on the perceived error's "effect or influence in determining the jury's verdict,"

14   and granted only if the effect or influence was "substantial and injurious."  *Brecht v. Abrahamson*,

15   507 U.S. 619, 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In other words,

16   Norford may only obtain relief on this claim if he can show the perceived error resulted in "actual

17   prejudice."  *Brecht*, 507 U.S. at 637 (citation omitted).

18        Norford contends that the admission of the photo lineup evidence was prejudicial error

19   because it was unduly suggestive.  *See* Amended Petition at 44:14-17.  As discussed above, the

20   California Court of Appeal was reasonable when it found that the photo lineup identification

21   procedure was not unduly suggestive and was reliable given the totality of the circumstances.

22   App. Opn. at 8-9.  Presentation of the eyewitness's lineup identification at trial was not an error,

23   let alone an error causing "substantial and injurious effect…[on] the jury's verdict."  *Brecht*, 507

24   U.S. at 637.  The California Court of Appeal was reasonable when it agreed with the trial court

25   that it "simply d[id] not conclude that [the identification evidence] was. . . prejudicial."  App. Opn.

26   at 8.

27        Norford's claim to habeas relief for due process violations or prejudice from the

28   identification procedure is DENIED.

United States District Court
Northern District of California

### III.   CLAIM OF FALSE EVIDENCE PRESENTED AT TRIAL

Norford argues that he is entitled to habeas relief under the Fourth Amendment's due process guarantee because the same photo lineup discussed above was "false evidence" knowingly submitted by the prosecution, as supported by the witness "recanting" her identification at trial. *See* Amended Petition at 45:1-13; *see also* Traverse at 26:1-26.  Norford raised this claim in the state habeas proceedings, not on direct appeal.  *See* State Habeas Order at 4-5.  The superior court rejected Norford's false evidence claim because Norford's argument and "evidence" in support was before the jury (*e.g.*, the witness was asked about her initial identification from the array and probed why she could not identify Norford at trial) and his arguments in his state court habeas petition "d[id] nothing to address the most likely scenario": that the witness "backtracked. . . out of fear."  *See* State Habeas Order at 4.

Respondent argues that this claim is not cognizable on federal habeas review because it is not based on a federal constitutional violation and has been procedurally defaulted.  Beyond that, Respondent contends that Norford cannot show that there was false or misleading evidence admitted at trial that could rise to the level of prosecutorial misconduct, which is how this type of claim is adjudicated in federal court.  *See* Ans. at 20:12-24:23.  I evaluate his claim on the merits, assuming without deciding that he clears the procedural bar, and find that the superior court was reasonable in its assessment of this claim and that he has not shown that the state court's decision was contrary to an unreasonable application of clearly established federal law.

#### A.   Legal Standard

"[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury."  *United States v. Agurs*, 427 U.S. 97, 103 (1976).  A conviction obtained through false evidence includes not only perjured testimony, but also false documents or other forms of admissible evidence.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959).

A claim under *Napue* will succeed when (1) the testimony or evidence was actually false, (2) the prosecution knew or should have known that the testimony or evidence was actually false,

and (3) the false testimony or evidence was material. *Henry v. Ryan*, 720 F.3d 1073, 1084 (9th Cir. 2013). Conclusory assertions will not suffice. *See id.* (finding that petitioner's conclusory assertion that any testimony inconsistent with the truth must be not only inaccurate but also perjured, does not constitute evidence sufficient to make out a *Napue* claim).

The test for materiality is whether there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury; if so, then the conviction must be set aside." *Hayes*, 399 F.3d at 984 (quoting *Belmontes v. Woodford*, 350 F.3d 831, 881 (9th Cir. 2003) (internal quotation marks omitted). Under this standard, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (quoting *Hall*, 343 F.3d at 983-84) (internal quotation marks omitted

### B.    The Superior Court Reasonably Found That Norford Has Not Shown the Eyewitness Identification Evidence was False

The superior court denied this claim because the eyewitness' testimony at trial that she was not sure why she identified Norford in the photo array and that he did not look like the person she saw on the day of the crime can be explained by the fear she had of reprisal for her identification. *See* State Habeas Order at 4-5. That is a reasonable conclusion.

To argue that the identification was false evidence, Norford relies on his arguments rejected above; the unduly suggestive identification procedure and the witness recanting the identification at trial. He also points to policy-based challenges to eyewitness identifications generally. *See* Amended Petition at 45:16-46:2 ("As discussed above, the prosecution wrongfully introduced [the eyewitness's] identification of Petitioner from an unconstitutionally suggestive photo array[.]"); *see also id.* at 46:21-53:4 ("Numerous California courts have concluded that []eyewitness identifications by strangers are often unreliable."). But as determined above, the California Court of Appeal was reasonable in concluding that the photo array was not unconstitutionally suggestive or unreliable. In addition to the plausible motivation the eyewitness had to recant on the stand, the appropriate focus is whether the eyewitness was honest at the photo

1    array, and not her later testimony at trial.  As the Superior Court summarized:

2           To paraphrase *In Re Roberts* (2003) 29 Cal. 4th 726, 743: "It is clear
            that [the witness] has lied at some point.  It is not clear however, that
3           it was [the initial] testimony that was false, rather than [the]
            recantation.  We will not disturb the jury's verdict based upon a
4           recantation that must be viewed with suspicion."

5    State Habeas Order at 7-8.

6           Norford next argues at length that the eyewitness identification should be considered false

7    based on recent policy research describing weaknesses in the reliability of eyewitness

8    identifications and the discussion of that research in a New Jersey state court opinion.  *See*

9    Amended Petition at 46:21-53:4; *see also State v. Henderson*, 27 A.3d 872, 877 (N.J. 2011)

10   (exploring available scientific literature to find a "troubling lack of reliability in eyewitness

11   identifications" generally).  He is correct that the Supreme Court has acknowledged that "the

12   annals of criminal law are rife with instances of mistaken identification."  *Perry*, 565 U.S. at 245

13   (quoting *United States v. Wade*, 388 U.S. 218, 228 (1967)).  But the Court in *Perry* concluded that

14   "the potential unreliability of a type of evidence does not alone render its introduction at the

15   defendant's trial fundamentally unfair."  *Id.* (acknowledging the many other constitutional

16   protections afforded a defendant, including the right to a trial by jury who weighs the evidence, the

17   right to confrontation, the right to effective counsel, the right to warn juries through jury

18   instructions, and the burden on the government to prove a defendant guilty beyond a reasonable

19   doubt to deny an exclusionary rule barring eyewitness identifications).  Because the Court ruled in

20   *Perry* that eyewitness identification in general is not so unreliable that it should be altogether

21   excluded from evidence, *see id.*, and Norford presents no support for his claim other than the

22   rejected arguments that it was unduly suggestive and unreliable, Norford has failed to satisfy the

23   first prong of *Naupe*.

24          Although I need not reach it, Norford also fails to satisfy the second *Napue* prong.

25   Norford asserts that the prosecution knowingly presented false evidence because the eyewitness

26   "was adamant that Petitioner was not the individual she saw outside the window during the

27   preliminary hearing[, so t]he Prosecution was on notice that [the eyewitness] no longer identified

28   Petitioner."  Traverse at 27:16-20.  He does not cite to the record to support this statement.  *See id.*

24

1    But Respondent cites to the preliminary hearing transcript to show that the eyewitness was *not*

2    asked to identify Norford in-person during the preliminary hearing (because Norford excused

3    himself from the courtroom during her testimony), and the eyewitness actually confirmed that she

4    had identified the picture of Norford from the array at the preliminary hearing.  *See* Ans. at 16 n.7;

5    *see also* CT Vol. 1, Ex. 1A-1 at 5-40.  There is no basis to show that the prosecutors had any

6    suspicion regarding the falsity of the eyewitnesses' identification of Norford from the array prior

7    to her attempt to recant at trial.

8        Norford has not shown the first two required elements of *Napue* are satisfied.  The superior

9    court was reasonable when it concluded there was not a constitutional error from the admission of

10   the eyewitness testimony.  *See* State Habeas Order at 7-8.

11   **IV.    CLAIM OF PREJUDICIAL ERROR BY ADMITTING EVIDENCE AT TRIAL OF
            PETITIONER'S UNCHARGED BEHAVIOR**

12       Norford also challenges the admission at trial of his uncharged involvement in a jailhouse

13   altercation with known gang members as being unfairly prejudicial as established by California

14   Evidence Code §§ 352 and 1101, and under California state caselaw.  Norford makes only a

15   passing reference to federal due process rights in the *heading* of this claim, but cites no federal

16   caselaw in support.  *See* Amended Petition at 54:9-22.  He unsuccessfully made the same

17   challenge on direct appeal and again in the state court habeas proceedings.  *See* App. Opn. at 9-10;

18   State Habeas Order at 5.  The California Court of Appeal held that admission of the jailhouse fight

19   evidence was not prosecutorial misconduct because it was necessary to show Norford's active

20   gang membership.  *See* App. Opn. at 9-10. The superior court also rejected this argument, noting

21   that Norford's claim that this evidence was "unnecessary" and duplicative was directly at odds

22   with his arguments that the gang evidence was weak concerning Claim 1,.  State Habeas Order at

23   5.

24       Respondent argues that the state law claims are not cognizable on federal habeas review

25   and that Norford's passing reference to "federal due process" is not sufficient to turn this state law

26   claim into a federal habeas claim.  *See* Ans. at 24:26-25:18.  Norford does not respond to

27   Respondent's challenges or otherwise argue this claim in his Traverse.  *See generally* Traverse.

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Even if I reject Respondent's procedural challenges to the claim and evaluate Norford's claim on

2    the merits, I find that he has failed to identify any federal basis for this claim.[8]  I find that Norford

3    has not shown and cannot show that the state court's rejection of this claim was contrary to or an

4    unreasonable application of clearly established federal law.

5    **V.     CLAIM OF CUMULATIVE PREJUDICE**

6          Norford contends that the errors asserted in the four claims addressed above created

7    cumulative prejudice at trial, and as a result his conviction must be reversed.  *See* Amended

8    Petition at 60:18-61:23; *see also* Traverse at 29:1-30:1.  He raised this claim in the state habeas

9    proceeding, and the superior court denied it because—having rejected each of Norford's claims of

10   error—"a claim for cumulative errors must logically be rejected."  *See* State Habeas Order at 5.

11   Respondent contends that the superior court was not objectively unreasonable in its logic, and

12   there was no "unique or critical thread" of errors that made Norford's trial "unfair" under federal

13   law.  *See* Ans. at 29:11-30:8 (quoting *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007)).

14   Because I have concluded above that there were no errors, much less that any part of the state

15   court decisions was contrary to or an unreasonable application of clearly established federal law,

16   Norford's theory of cumulative error fails.

17   **VI.    CLAIM OF INNOCENCE**

18         Norford briefly asserts that he is actually innocent of the crimes he was convicted of at trial

19   and as a result is entitled to habeas relief.  *See* Amended Petition at 62:1-14; *see also* Traverse at

20   30:2-19 (rearguing the falsity of the eyewitness testimony and noting the surviving victim could

21   not identify Norford).  The superior court addressed this claim in the habeas proceedings, holding

22   that this claim was "entirely conclusory" and presented "no additional evidence. . . [to e]stablish []

23   a claim of actual innocence[.]"  *See* State Habeas Order at 9.  Respondent further contends that

24

25   ───────────────────

     [8] The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

26   prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."
     *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of

27   irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but
     not contrary to, or an unreasonable application of, clearly established Supreme Court precedent

28   under § 2254(d)); *see, e.g., Zapien v. Martel*, 849 F.3d 787, 794 (9th Cir. 2016) (concluding that
     because there is no Supreme Court case establishing the fundamental unfairness of admitting
     multiple hearsay testimony, *Holley* bars any such claim on federal habeas review).

1    claims of actual innocence are not cognizable in non-capital federal habeas review.  *See* Ans.

2    30:11-31:25.

3           Norford rests his argument on the claims of error rejected above and identifies no new

4    evidence to satisfy the extraordinarily high standard for showing actual innocence.  Assuming

5    without deciding that Respondent's procedural challenge does not bar this claim, it fails because

6    the superior court's decision was not contrary to or an unreasonable application of federal law.

7    **VII.    REQUEST FOR AN EVIDENTIARY HEARING**

8           In passing in his Petition, and in the request for relief in his memorandum in support,

9    Norford requests an evidentiary hearing and discovery to develop his claims.  *See* Amended

10   Petition at 6-7; Traverse at 31:1-3.  He does not address this request in any substance, makes no

11   argument, and wholly fails to identify what evidence could be adduced from discovery and an

12   evidentiary hearing.  *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) ("[i]n deciding whether to

13   grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an

14   applicant to prove the petition's factual allegations," and whether those allegations, if true, would

15   entitle him to relief); *see also Ochoa v. Davis*, 50 F.4th 865, 890–91 (9th Cir. 2022) (same).  His

16   requests for an evidentiary hearing and additional discovery are DENIED.

**CONCLUSION**

17

18          Norford's Amended Petition for writ of habeas corpus is DENIED.

19          **IT IS SO ORDERED.**

20   Dated: February 27, 2024

21

22

23                                              William H. Orrick
                                                United States District Judge
24

25

26

27

28

27